No.: 23-15320 D.C.

𝕴𝖓 𝕿𝖍𝖊

# United States Court of Appeals
# For The Ninth Circuit

**LISA LEAKE, KRISTEN GRACE, JOSEPH HEYSER, CHRISTOPHER STEIN, AND LESLIE ZEPEDA, AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED,**

*Appellants,*

v.

**RAYTHEON TECHNOLOGIES, INC.**

*Appellees,*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

————————

## BRIEF OF APPELLANTS

————————

Appeal from No.: 4:22-cv-00436-RM

**Nancy Knox Bierman**
**Libra Law Texas**
**F204 Munford St.**
**Houston, TX 77002**
**(713) 836-9990**

*Counsel for Appellants*

**TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................. 4

INTRODUCTION .......................................................................... 10

JURISDICTIONAL STATEMENT ......................................................... 13

STATEMENT OF THE ISSUES ............................................................ 13

STATEMENT OF RELATED CASES AND PROCEEDINGS ........................... 14

STATEMENT OF THE CASE .............................................................. 14

    Relevant Facts ....................................................................... 14

    Proceedings Below ................................................................ 18

    Rulings Presented for Review ................................................... 18

SUMMARY OF THE ARGUMENT ....................................................... 19

ARGUMENT ............................................................................... 21

    Standard of Review ............................................................... 21

    I.    THE DISTRICT COURT ERRED BY FAILING TO ACCEPT AS TRUE THE ALLEGATIONS OF A HOSTILE WORK ENVIRONMENT FACTUALLY SUPORTING A TITLE VII CLAIM ................. 23

II.     THE DISTRICT COURT ERRED BY FAILING TO ACCEPT
        AS TRUE THE ALLEGATIONS OF DISPARATE
        TREATMENT FACTUALLY SUPPORTING A TITLE VII
        CLAIM
        ..........................................................................................25

III.    THE DISTRICT COURT ERRED BY FAILING TO ACCEPT
        AS TRUE THE ALLEGATIONS OF RETALIATION
        FACTUALLY SUPPORTING A TITLE VII
        CLAIM…………………29

IV.     THE DISTRICT COURT ERRED BY HOLDING
        THAT PLAINTIFF'S DUE PROCESS AND
        EQUAL PROTECTION CLAIMS WERE
        SUBJECT TO RATIONAL BASIS
        REVIEW.......32

        A. Informed Consent is a Fundamental Right…32

        B. Unconstitutional Conditions Doctrine Prohibits Coercion.......37

        C. Raytheon's Policy Requires Heightened Scrutiny .........................38

        D. Raytheon's Policy Fails Even Rational Basis.................................40

V.      THE DISTRICT COURT ERRED BY RULING THERE
        WERE NO EQUAL PROTECTION CLAIMS**…………**46

VI.     THE DISTRICT COURT ERRED BY FAILING TO SEE THAT
        THE  PLAINTIFFS WERE ENAGED IN PROTECTED ACTIVITY
        VIS A VIS  THEIR ONGOING EEOC COMPLAINTS.............48

CONCLUSION.......................................................................................51

STATEMENT REGARDING ORAL ARGUMENT .............................................51

COMBINED CERTIFICATIONS............................................................................52

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Pg.**

*Acosta v. Foreclosure Connection, Inc.*, 903 F.3d 1132 (10th Cir. 2018)……….31

*American Racing Equipment, Inc. v. Unemployment Compensation Board of Review*, 144 Pa. Commonwealth Ct. 310, 601 A.2d 480 (1990)…………………27

*Arnav Indus. v. Brown, Raysman, Millstein, Felder & Steiner LLP*, 96 NY2d 300, 303 (NY 2001)………………………………………………………….…...23

*Ashcroft v. Iqbal*, 566 U.S. 662
(2009)....................................................................................................................40

*Bastidas v. Good Samaritan Hosp. LP* (9th Cir. 2019)…………………………27

*Burson v. Freeman*, 504 U.S. 191, 198 (1992)……………………………………….37

*Brown v. Card Service Center*,
    464 F.3d 450 (3d Cir. 2006) ........................................................................22

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020)………..40

*Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000)……………29

*Crawford v. Met. Gov. of Nashville*, 555 U.S. 271, 276 (2009)…………………49

*Cruzan v. Director, Missouri Dept. of Health*,
    497 U.S. 261 (1990)...........................................................................*passim*

*Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)…………………27

*DeMuria v.Hawkes*, 328 F.3d 704 (2d Cir. 2003)…………48

*Forsberg v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1419 (9th Cir. 1988)….29

*Gould Elecs., Inc. v. United States*,
    220 F.3d 169 (3d Cir. 2000) ........................................................................23

*Halgren v. City o Naperville*,
    No. 21-cv-05039, 2021 WL 5998583 (N.D. Ill. Dec. 19, 2021)...................37

*Harris v Forklift Systems.*, 963 F. 3d. (2019)
    963 F.3d 301 (3d Cir. 2020) ........................................................................24

*Hartnett v. Pennsylvania State Education Assoc.*, 963 F.3d
301, 305 (3d Cir. 020)……………………………………………………32

*Jones v. Rooms to Go* (S.D. Tex. 2020)………………………………………..27

*Ingraham v. Wright*,
  430 U.S. 651 (1977)……………………………………………33
*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016) ………………………………………30

*In re Rockefeller Ctr. Props. Sec. Litig.*,
  311 F.3d. 198 (3d Cir. 2002) ……………………………………22
*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905)………………………………………………*passim*

*Koontz v. St. Johns River Water Mngmt. Dist.*,
  570 U.S. 595 (2013)……………………………………34, 35, 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)……………………………………………30

*Palm Beach Cnty. Sch. Bd. v. Wright*, 217 So.3d 163 (Fla. App. 2017…………..…32

*Perry v. Sindermann*,
  408 U.S. 593 (1972)……………………………………………34
*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)…………..…29

*Pinker v. Roche Holdings, Ltd.*,
  292 F.3d 361 (3d Cir. 2002) ……………………………………22

*Memorial Hospital v. Maricopa County*, 415 U.S. 250, 269 (1974…………..…34

*Remcon Plastics, Inc. v. Unemployment Compensation Bd. of Review*, 651 A.2d
671 (Pa. Commw. Ct.
1994…………………………………………………………………27
*Rennie v. Klein*,653 F.2d 836, 844 (3d Cir. 1981)……………………………33,34
*Rumsfeld v. Forum for Academic and*
*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)……………………………………………40

*Rovello v. Orofino Realty Co.*,
 40 N.Y.2d 633, 636, 357 N.E.2d 970 (1976)……………………………23

*Rutan v. Republican Party of Ill.*,497 U.S. 62 (1990); …………………………..34

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540(1983)………….34

*Schloendorff v. Society of New York Hospital,*
  211 N.Y. 125 (1914) ..................................................................................35

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..................................................................................30

*Union Pacific R. Co. v. Botsford*,
  141 U.S. 250 (1891)..................................................................................35

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 186 L. Ed.
2d 503, 24 Fla. L. Weekly Supp. 366 (2013), at 2534………………………………..32

*Vig v. The New York Hairspray Co*., LP, 67 A.D.3d 140, 145……………………..23

*Village of Willowbrook v. Olech*,
  528 U.S. 562 (2000)..................................................................................48

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)...........................................................................*passim*

*Washington v. Harper,*
  494 U.S. 210 (1990)................................................... 33, 34, 37-38

*White v. Napoleon*,
  897 F.2d 103 (3d Cir. 1990) ...............................................................33, 35

*Yanowitz v. L'Oreal* USA, Inc. (2005) 36 Cal.4th 1028, 1042…………...……..31

*Youngberg v. Romeo,*
  457 U.S. 307 (1982)...............................................................................33, 34

**Statutes:**

21 U.S.C. § 360bbb-3.........................................................................*passim*

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) .............................................*passim*

28 U.S.C. § 1291 ..........................................................................................13

28 U.S.C. §
1331 .............................................................................................13

42 U.S.C. § 1983 ...................................................................13

40 U.S.C. § 9501 ..................................................................15

**Constitutional Provisions:**

U.S. Const. amend. XIV ....................................................*passim*

U.S. Const., Art. VI, cl. 2.................................................*passim*

**Regulations:**

21 C.F.R. § 50.20 .................................................................32

45 C.F.R. § 46.116 ..............................................................32

**Rules:**

Fed. R. Civ. P. 12(b)(1).......................................................17

Fed. R. Civ. P. 12(b)(6)........................................................17

**Other Authorities:**

1. FDA, *Understanding the Relevant Terminology of Potential Preventions and Treatment for COVID-19,* FDA.gov. (Oct. 2020) ("an investigational drug can also be called an experimental drug") at https://www.fda.gov/media/138490/download…..10,11.17

2. COVID19 PCR Tests are Scientifically Meaningless − Bulgarian Pathology Association (bpa-pathology.com)…………45

3. 2022 Medical Device Recalls | FDA………45

4. Sigfried Cagat
   *Top Ten Raytheon Contracts in 2022*
   https://www.govconwire.com/author/siegfried-cagat

5. Josh Guetzkow,
   *CDC Admits It Never Monitored VAERS For*

*COVID Vaccine Safety Signals*, The Defender (June 21, 2022) at
https://childrenshealthdefense.org/defender/cdc-vaers-covid-
vaccine-safety/..................................................................11,17

6. Jack Phillips,
*Pfizer Exec Admits COVID Vaccine Was Not Tested For
Preventing Transmission*, The Defender (Oct. 12, 2022) at
https://childrenshealthdefense.org/defender/pfizer-covid-
vaccine-never-tested-prevent-transmission-et ..............11,17

7. K. Bardosh, et al.,
*COVID-19 Vaccine Boosters for Young Adults: A Risk-Benefit
Assessment and Five Ethical Arguments against Mandates at
Universities* (Aug. 31, 2022), at
https://papers.ssrn.com/sol3/papers.cfm?abstract.............15

8. Kisielinski K, Hirsch O, Wagner S, Wojtasik B, Funken S, Klosterhalfen B,
Kanti Manna S, Prescher A, Sukul P and Sönnichsen A (2023)
*Physio-metabolic and clinical consequences of wearing face masks—
Systematic review with meta-analysis and comprehensive evaluation*. Front.
Public Health 11:1125150. doi:
10.3389/fpubh.2023.1125150…………………………45

9. Isabell Wagenhäuser, Alexander Gabel, Anna Höhn, Thiên-Trí Lâm, _Lukas
B. Krone, _Anna Frey, Alexandra Schubertunkmeir, Lars Dölken, _Stefan Fra
ntz, _Oliver Kurzai, _Ulrich Vogel, _Manuel Krone, Nils Petri *Inability to work
following COVID-19 vaccination among healthcare workers - an important
aspect for future booster vaccinations…………42*

10. National Toxicology Program, Department of Health, and Human Service
*Report on Carcinogens Fifteen Edition Ethylene Oxide CAS No. 75-21-8 A
Known human carcinogen…………………………………45*

11. James A. Thorp 1*, Claire Rogers 2, Michael P. Deskevich 3, Stewart
Tankersley 4, Albert Benavides 5, Megan D. Redshaw 6 and Peter A.
Mcllough
*COVID-19 Vaccines: The Impact on Pregnancy Outcomes and Menstrual
Function………10,11,12,42*

12. Saad Alhumaid, Fatemah M. ALShakhs, Javed Muhammad, Fadil Alhelal,
Mohammed Hussain Al Khamees, Hussain Ahmed Alessa, Mohammed
Ahmed Alissa *New-onset and relapsed liver diseases following COVID-19
vaccination: a systematic review……10,11,12,42.*

13. Vakharia RJ, Jani I, Yadav S, Kurian T.

*To study acute changes in brain oxygenation on MRI in healthcare workers using N95 mask and PPE kits for six hours a day. Ind J Radiol Imaging.* (2021) 31:893–900. doi: 10.1055/s-0041-174108………45

14. Xu H, Xu H.
    *Effect of chronic hypoxia and hypercapnia on learning and memory function in mice and the expression of NT and CGRP in brain. Eur J Inflamm.* (2018) 6:2058739218818956. …45

15. COVID-19-Vaccine-Candidates-and-Abortion-Derived-Cell-Lines.pdf (lozierinstitute.org)…………..15

16. Pfizer fined $2.3 billion for illegal marketing in off-label drug case - ABC News (go.com)………..45

17. Justice Department Announces Largest Health Care Fraud Settlement in Its History | OPA | Department of Justice………45

18. Johnson & Johnson Ordered to Pay $572 Million in Landmark Opioid Trial - The New York Times (nytimes.com)…………45

19. Johnson & Johnson Reaches Deal for $8.9 Billion Talc Settlement - The New York Times (nytimes.com)……………..45

20. EPA proposes limits on carcinogenic gas used to sterilize medical devices (statnews.com)

21. Justice Department Announces Largest Health Care Fraud Settlement in Its History | OPA | Department of Justice **Pfizer to Pay $2.3 Billion for Fraudulent Marketing………..45**

22. COVID-19-Vaccine-Candidates-and-Abortion-Derived-Cell-Lines.pdf (lozierinstitute.org)………………15

## INTRODUCTION

This appeal raises an important question: Does an employer have the legal authority to coerce an employee's consent to a highly invasive injection of a yet-to-be fully investigated *experimental* vaccine that does not prevent the spread of disease and poses the risk of serious harm under the guise of workplace safety. Appellants are former employees at Raytheon Technologies, who brought this action to challenge their termination for refusal to be injected with an experimental, potentially unsafe product under the guise of workplace safety, and/or refusing to comply with onerous masking and testing protocols that were specifically designed to segregate them and ostracize them in the workplace.

On April 18, 2023, the FDA updated their recommendations regarding COVID 19 vaccines. The monovalent vaccines will no longer have EUA in the US. At all times relevant to this appeal, all currently available COVID-19 vaccines remain under clinical study. They remain in every legal and practical sense *experimental.* Further these vaccines are now generally known not to prevent infection or transmission, and to pose significant risks (e.g., myocarditis, blood clots, stillbirth, neurological disorders, etc.).(1) (11)(12).

Raytheon made the decision to mandate these experimental vaccines on Employees only nine months after they were made available under an Emergency Use

Authorization ("EUA"), a mechanism purposely intended to bypass rigorous safety

and efficacy testing that the Food and Drug Administration ("FDA") typically

requires for drugs and biologics. The Vaccine Adverse Event Reporting System

("VAERS"), operated by the FDA and the Centers for Disease Control and

Prevention ("CDC"), is the primary national repository of adverse event

information.

As of April 4, 2023, VAERS showed 1,458,322 reports of adverse events

from all age groups following COVID-19 vaccination, including 31,961 deaths and

465,274 serious injuries.(5) The district court as well as this Court are required to

accept these allegations as

True:

1) That COVID-19 vaccines do not prevent transmission.

2) That COVID-19 vaccines do not prevent infection.

3) That COVID-19 vaccines cannot be shown to prevent outbreak of
   disease.

4) That COVID-19 vaccines cannot be proven to promote economy and
   efficiency in federal contracting.

T Jack Phillips, *Pfizer Exec Admits COVID Vaccine Was Not Tested For
Preventing Transmission*, The Defender (Oct. 12, 2022) These predicates being

true, then it is irrational for Raytheon to mandate them to prevent transmission.

Furthermore, these experimental vaccines pose a serious risk of injury and even death. Josh Guetzkow, *CDC Admits It Never Monitored VAERS For COVID Vaccine Safety Signals*, The Defender (June 21, 2022) at

https://childrenshealthdefense.org/defender/cdc-vaers-covid-vaccine-safety

As a result, any purported benefit to employees is outweighed by the constitutionally guaranteed right to informed consent and to refuse unwanted medical treatment. Employers cannot legally be permitted to mandate experimental vaccines that are still under investigation for efficacy and safety. The lack of information makes it impossible to weigh benefit against risk in order to mandate them for any specific public health benefit. If vaccines do not prevent transmission, the argument that they are necessary to protect others has no basis in fact and deserves no legal weight.

Additionally, since these vaccines admittedly do not prevent transmission, Raytheon cannot lawfully treat vaccinated and unvaccinated employees differently. Discrimination between these two groups is unreasonable and arbitrary.(1)(11)

The right to Due Process and Equal Protection means the ability to to choose freely, without coercion, on medical procedures that are permanent in nature. This is not a hard hat or a seatbelt. This is a permanent change in one's RNA, which will continue to produce spike proteins for an undetermined amount of time. This technology is novel, previously utilized for "last ditch attempt" cancer

treatments as the nanoparticles are capable of crossing the blood-brain barrier and effectively treating aggressive forms of brain cancers. mRNA Cancer Treatment Research - Mayo Clinic Press. Those who refuse should not be treated as outcasts, shunned by civil society, from public gatherings and public places, fired from jobs, and banned from schools. That is discrimination, not public safety.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §1331 because this case concerns questions of federal law, namely the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §1983, and 21 U.S.C. §360bbb-3. This Court has appellate jurisdiction under 28 U.S.C. §1291 as on February 27, 2023, the district court entered an Order rendering a final judgment. dismissing all of Plaintiffs' claims, and Plaintiffs filed a timely notice of appeal on March 5, 2023.

## STATEMENT OF THE ISSUES

1. Did the district court err by misapplying the applicable standard of review and review all the allegations in the Initial Complaint?

2. Did the district court err by comparing the unvaccinated employees with each other rather than using a compassion between the vaccinated and the unvaccinated, thereby understanding the disparate treatment claim.

3.  Did the district court err by applying rational basis review to employees' Due Process and Equal Protection challenges to Raytheon Policy, and by otherwise dismissing these claims?

4.  Did the district court err by misinterpreting and dismissing employees' Equal Protection claims?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously, and Appellants are aware of other cases pending in other jurisdictions, to include The District of Arizona-Phoenix Division.

## STATEMENT OF THE CASE

### Relevant Facts

On September 9, 2021, President Biden signed EO 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, mandating that all federal contractors and subcontractors implement COVID-19 safety protocols in their workplaces, including vaccine mandates. EO 14042 directed the SFWTF to issue guidance and work with the Federal Acquisition Regulatory Council to implement the order. EO 14042 was challenged in federal court and on December 7, 2021, U.S. District Court Judge R. Stan Baker of the Southern District of Georgia issued a

nationwide injunction against the enforcement of the vaccine mandate for federal contractors. The injunction was primarily issued on the grounds that the mandate exceeded the president's authority under the Federal Property and Administrative Services Act (FPASA). Since the issuance of the original preliminary injunction against President Biden's COVID-19 vaccine mandates on December 7, 2021, the Fifth, Sixth, Ninth and Eleventh Circuits have all weighed in on injunctions issued by district courts.

These employees maintain a variety of objections to COVID-19 vaccination: religious, medical, and practical.(15)(22).All of the employees requested and received a religious exemption, with the exception of Lisa Leake, whose exemption was denied due to a "lack of doctrine" and Jospeh Heyser, who chose to terminate his own employment, rather than fight what he perceived to be a "losing battle from the start".  Additional to their religious objections, many had medical concerns, as well   as the coercive methods utilized to obtain full compliance. They instead   exercised their right to informed consent and concluded that the unknown risks of COVID-19 vaccination outweigh the known risks of the disease for  each of them. Raytheon is not an elected body or a board of health.  Raytheon mandated

COVID-19 vaccines after they were on the market for only a few months. All COVID-19 Vaccines available in the United States were authorized under Section 564 of the Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §360bbb-3, which empowers the FDA to issue an "Emergency-Use Authorization" ("EUA") for a medical drug, device, or biologic, such as a vaccine, under certain emergency circumstances. These vaccines available to the public that had not gone through FDA's full approval process; all COVID-19 vaccines, PCR testing and even masks are authorized for emergency use pursuant to Section 564. Section 564 required the FDA to establish certain required conditions: among them the requirement that individuals to whom the product is administered are informed of "the option to accept or refuse administration of the product." FDA imposed and enforced the "option to accept or refuse" condition by requiring the distribution to potential vaccine recipients of Fact Sheets that state, "It is your choice to receive or not receive [the vaccine]" and this statement appears in the EUA Fact Sheet for each of the three EUA COVID-19 vaccines.(1)

The FDA and the National Institutes of Health ("NIH") refer to EUA products as both "investigational" and "experimental" and use those terms interchangeably to describe them. COVID vaccines employed a novel technology that has never been put in widespread use in humans, thus safety cannot be adequately determined at the time of policy implementation. These vaccines cannot

promise herd immunity to any population; and their effectiveness which remains an open question is vastly overstated.(6) COVID-19 vaccines skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity – these vaccines were never tested to establish if they will change human genetic material, reduce fertility, cause birth defects or cause cancer.  Plaintiffs allege the novelty and risks of COVID-19 vaccines and point to the increasing number of reported  vaccine injuries (VAERS last checked April 3, 2023) Plaintiffs alleged that Raytheon had a conflict of interest in making any decision to impose a

COVID-19 vaccine mandate due to its significant dependence on continued government defense dollars, and to ignore that fact is akin to ignoring the sun and the moon.

Since briefing the motion to dismiss, a number of developments bolster Plaintiffs' allegations about the lack of safety and effectiveness of COVID vaccines.  Freedom of Information Act ("FOIA") requests led to the release of an unredacted Pfizer pharmacovigilance safety analysis collecting 42,086 adverse event reports in the first three months of the vaccine rollout: including 1,223 deaths. In another FOIA document release CDC admitted it never monitored VAERS for COVID-19 vaccine safety signals.(11)

On October 10, 2022, Pfizer's Janine Small, President of International Developed Markets, told the European Parliament that before Pfizer released its

COVID-19 vaccine into the market, neither she nor other Pfizer officials knew whether the vaccine would prevent transmission because the drugmaker had not tested for it.

## Proceedings Below

Plaintiffs filed this action against Raytheon in the United States District court for the District of Arizona on September 24 , 2022, seeking a declaratory judgment, and damages.(ER-4) Plaintiffs challenged Raytheon Policy as a violation under the Due Process Clause and the Equal Protection Clause of the Fourteenth, as well as Title VII. They sought damages under Section 1983. No injunction was sought at that time. A Motion to Dismiss for Failure to State and Claim was filed on December 2, 2022, by Defendants (ER-3) Plaintiffs filed response to the motion on December 16, 2022, (ER- 2). The Court entered a Motion to Dismiss on Failure to State a Claim (ER-1)February 27, 2023.

## Rulings Presented for Review

On February 27, 2023, the district court issued its Opinion and Order dismissing Plaintiffs' complaint with prejudice and instructing the Clerk to close the matter.(ER-1). The district court ruled that employees had not endured disparate treatment, failed to prove hostile work environment, failed to prove harassment, failed to prove their retaliation claims, and failed to prove that they

were otherwise engaged in protected activity vis a vis their EEOC Complaints.

Concluding that Plaintiffs' claims did not involve fundamental rights or a suspect

classification, the district court applied rational basis review to rule that Raytheon

Policy, finding it was rationally related to a legitimate government interest of

protecting the employees from transmitting COVID-19, presuming that COVID-19

prevent transmission and the vaccines are safe and effective.

The district court also ruled that unvaccinated employees are not members of

a protected class and that their claims of disparate treatment satisfy a rational basis.

. The district court also found that Raytheon had legal authority under the

Executive Order, to mandate these experimental COVID vaccines as a condition of

employment, despite the stay of the Order prior to all the terminations, which all

took place in 2022.

## SUMMARY OF THE ARGUMENT

The district court failed to accept as true all of the allegations in the

Initial Complaint, and that failure taints its legal conclusions. Against the

allegations in the complaint, the district court adopted the view that COVID-19

vaccines are safe and effective, and that COVID-19 vaccines prevent infection and

transmission: that COVID-19 is a vaccine-preventable disease; and that Raytheon had no financial incentives to mandate this vaccine. These facts contradicted the allegations that the district court was bound to accept as true, and this Court should remand for further proceedings.

The district court further erred by holding that Raytheon Policy is subject to rational basis review. The district court reached that conclusion by ignoring well-settled Supreme Court and Third Circuit precedents, establishing that the right to informed consent and the corollary right to refuse unwanted medical treatment are fundamental rights and therefore should be subject to a heightened standard of review, if not strict scrutiny. A pplied in conformity with the unconstitutional condition's doctrine developed by the Supreme Court in the last half century: "the government may not deny a benefit to a person because he exercises a constitutional right."

Alternatively, even if rational basis review were to apply to the challenge against experimental vaccine mandates, the district court refused to acknowledge that the COVID 19 vaccines do not stop transmission, do not stop infection, have sever potential side effects, and have minimal short-term efficacy at best, requiring continuous addition doses in order to remain "up to date" on the vaccines. This mandate cannot be found to be rationally related to the purpose of preventing

transmission in the workplace, and it is even less rational to mandate remote employees to take it.

Lastly, Federal law requires informed consent freely given for emergency-use authorized vaccines; Raytheon Policy conflicted with that law by coercing consent at the point of a metaphoric gun, forcing Plaintiffs to choose between the jobs they loved and the violation of their strongly held religion beliefs.

## ARGUMENT

### Standard of Review

This Court exercises "plenary review over the grant of a motion to dismiss." *Brown v. Card Service Center*, 464 F.3d 450, 452 (3d Cir. 2006). "When considering an appeal from a Rule 12(b)(6) dismissal," this Court "must accept all well-pled allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving party." *Id.* (citing *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d. 198, 215 (3d Cir. 2002). "In doing so, we must determine whether the plaintiff may be entitled to relief under any reasonable reading of the Complaint." *Id.* (citing *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

When reviewing a district court's Rule 12(b)(1) dismissal for mootness, this Court "review[s] the district court's factual findings for clear error and its legal conclusions de novo." *Hartnett v. Pennsylvania State Education Assoc.*, 963 F.3d

301, 305 (3d Cir. 2020). "[T]he standard for reviewing a Rule 12(b)(1) motion is lower than that for a Rule 12(b)(6) motion," however, and "[a] claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous." *See Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176-77 (3d Cir. Employment discrimination cases, such as this, are subject to the notice pleading standard, meaning that Plaintiff "need not plead [specific facts establishing] prima facie case of discrimination" but need only give "fair notice" of the nature of the claim and its grounds. *Vig v. The New York Hairspray Co*., LP, 67 A.D.3d 140, 145 (1st Dep't 2009) (quoting *Swierkiewicz v. Sorema*, N.A., 534 U.S. 506, 514-515 (2002)). In applying this most liberal pleading standard, the Court must also "accept as true every allegation in the pleading and accord the pleader every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory." *Arnav Indus. v. Brown, Raysman, Millstein, Felder & Steiner LLP*, 96 NY2d 300, 303 (NY 2001). In short, "the criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one." *Rovello v. Orofino Realty Co*., 40 N.Y.2d 633, 636, 357 N.E.2d 970 (1976).

**I.  THE DISTRICT COURT ERRED BY FAILING TO ACCEPT AS TRUE THE ALLEGATIONS OF A HOSTILE WORK ENVIRONMENT FACTUALLY SUPORTING A TITLE VII CLAIM**

The Supreme Court, held that: (1) to be actionable under Title VII as "abusive work environment" harassment, the conduct need not seriously affect an employee's psychological well-being or lead the employee to suffer injury; (2) The Meritor standard requires an objectively hostile or abusive environment as well as the victim's subjective perception that the environment is abusive; and (3) whether an environment is sufficiently hostile or abusive to be actionable requires consideration of all the circumstances, not any one factor. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)**.**

All of the district court's rulings rest on facts and assumptions that contradict Plaintiffs' allegations in the Initial Complaint.  T h e  court assumed that Raytheon was capable of making the determination that COVID-19 vaccines were safe and effective, thus entitled to mandate them.  Read in the light most favorable to the non-moving party, Plaintiffs alleged numerous facts that Raytheon could not make that assessment.  More specifically, the district court assumed, against Plaintiffs' allegations, that COVID-19 vaccines prevent infection and transmission. Citing the vaccine manufacturers and the FDA, there was insufficient data available to show that these vaccines prevented infection or transmission.(1)(11)

As a result, the district court cannot assume that they did, or that Raytheon logically came to such a determination, or that Raytheon was even capable of making any analysis of benefit versus risk when it decided to mandate COVID-19 vaccines on over 174,000 employees. Based on the lack of information at the time these vaccines were mandated, Plaintiffs allege that it is not possible to make that assessment given the current state of knowledge and science.  Similarly, the district court assumed, contrary to Plaintiffs' allegations, that COVID-19 is a *vaccine-preventable* disease. It is not.(1)(11)

These facts may remain in dispute but at the pleading stage, Plaintiffs' version of the facts must be accepted as true.  Finally, the District Court totally ignored, without any explanation or basis, that Raytheon's monetary interests may have played a role in the implementation of the Policy. Plaintiffs allege that Defendant, as a defense contractor, working hand-in-hand with the Federal Government , a government that has since awarded over $12,340,000,000 to Raytheon in defense contracts for 2022 alone (4), it had conflicts of interest in making the decision to mandate COVID-19 vaccines. This staggering amount alone suggests that Raytheon' monetary interests influenced its decision to mandate a vaccine that does not work.  Since those facts are necessary to a court's analysis whether Raytheon' mandate is sufficiently associated (e.g., rationally related, or

narrowly tailored) to a legitimate interest, a record on those facts must be developed before the district court can render judgment on the employees' claims.

Employees are not asking for this Court to determine the most *effective* way to protect the public against COVID-19. Their claim is more modest – they are asking this Court to determine that an experimental vaccine, whose safety and efficacy is not fully understood, that has not been proved to prevent infection or transmission, cannot be mandated to stop disease spread. If allowed at the district court, employees could have actually proven that Raytheon did not know if the vaccines prevented transmission at the time the Policy began, this defeating the claim that the mandate was rationally related to its express purpose to prevent the spread of COVID-19. The relationship between the vaccine, its ineffectiveness at preventing the spread of COVID-19, and Raytheon' purported objectives are even more irrational as applied to employees who had worked on site throughout the entire pandemic period until October 2022. The district court's failure to accept these facts is a reversible error.

## II. THE DISTRICT COURT ERRED BY FAILING TO ACCEPT AS TRUE THE ALLEGATIONS OF DISPARATE TREATMENT FACTUALLY SUPPORTING A TITLE VII CLAIM

To establish a prima facie case of disparate treatment, an employee must show that: (1) they belong to a protected class; (2) they were qualified for the

position; (3) they were subject to an adverse employment action; and (4) "similarly situated individuals outside [this] protected class were treated more favorably." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)...*Bastidas v. Good Samaritan Hosp. LP* (9th Cir. 2019).

The essence of disparate treatment is not only whether unlawful discrimination has or has not occurred, but also must consider whether similarly situated people are treated differently, based upon an improper criterion. *American Racing Equipment, Inc. v. Unemployment Compensation Board of Review*, 144 Pa. Commonwealth Ct. 310, 601 A.2d 480 (1990). An employer must offer evidence of proper criteria such as business necessity to justify the disparate treatment of employees. *Remcon Plastics, Inc. v. Unemployment Compensation Bd. of Review,* 651 A.2d 671 (Pa. Commw. Ct. 1994). In bringing a claim for disparate treatment "it is necessary to compare the employees' treatment with that of other similarly situated employees. ". *Jones v. Rooms to Go* (S.D. Tex. 2020). The District Court erred in its application of the term "similarly situated" grouping all UNVACINATED employees together instead of comparing them to the vaccinated employees, which was the distinction that caused the "disparate treatment" in the first place. Of course, all unvaccinated employees were treated the same, as second-class citizens, not entitled to use the gym, the cafeteria, travel, or attend meetings without wearing a distinctive mask and distanced from the other un-

masked workers, or worst of all, as in this case "never coming back to the office", in the words of Greg Hayes, Raytheon's chief executive.(" we will have to make sure that we keep the rest of the employees safe.   So that may mean, someone who is not vaccinated is NEVER coming back to the office."-Greg Hayes at Economic Club of Washington Event  April 8, 2022.)

Vaccinated employees could engage in all forms of the usual conduct and enjoy all the usual employee privileges while Plaintiffs were disciplined, disregarded, belittled, verbally abused, and ultimately fired under the pretext of refusing an experimental emergency use authorized substance (now off-market) into their bodies. Plaintiffs allege that Defendants "created a hostile work environment through the discriminatory words and actions towards Plaintiffs for no other reason than refusal betray their strongly held religious beliefs, despite the clear inability for Raytheon to  assert that these vaccines were "safe and effective".

In addition, Plaintiffs have all established that their job performance was satisfactory and provided evidence, either direct or circumstantial, to support a reasonable inference that the terminations were discriminatory.

The amount of evidence that Plaintiffs must produce is "very little," *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000), so long as it is more than "purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars." *Forsberg v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1419 (9th Cir. 1988). *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

Several Plaintiffs did not request a medical or religious exemption and as a result of Raytheon Policy were terminated from their employment. The remaining employees received religious exemptions, however, those exemptions came with the conditions of submit to weekly testing, to mask, denial of access to common areas such as the Employee Rec Center, the common cafeteria, travel, and in many cases, in-person meetings thus preventing them from participating in group projects, peer-building camaraderie, and most importantly opportunities for promotions and bonuses. Vaccinated employees were not subject to these conditions. Raytheon also reserved the right to impose additional conditions upon exempted employees at any time. Exempted employees allege that these were unconstitutional conditions, as the vaccine was ineffective in the prevention of both infection and transmission. Vaccinated employees could spread the disease as easily as unvaccinated employees. Therefore, vaccinated, and unvaccinated employees were distinct cohorts, and any disparate treatment between them required legal justification. Nevertheless, the district court erroneously held that

there was no disparate treatment due to its failure to correctly compare the two groups, instead focusing on only the treatment of the unvaccinated, while ignoring the obvious disparities between the treatment of the unvaccinated employees and the favorable treatment granted those who chose to vaccinate. This is tantamount to erroneous interpretation of well-established legal principles and clearly can be seen as poor legal reasoning, even by the lowliest of local attorneys honored to practice before this esteemed Court.

Plaintiffs have alleged an 'invasion of a legally protected interest' that is concrete, particularized, and imminent.") (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (quoting *Lujan v.Defs. of Wildlife*, 504 U.S. 555, 560 (1992) and *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016)); At the time of their termination , only unvaccinated employees were subject to routine (weekly) testing and barred from travel, in person meetings, and communal areas previously mentioned. At no point did Raytheon require everyone to mask regardless of vaccination status, despite new guidance from the CDC in July 2022. Sadly, in its analysis, the District Court ignored that and all the other conditions that Raytheon continued to impose on exempt employees.

### III. THE DISTRICT COURT ERRED BY FAILING TO ACCEPT AS TRUE THE ALLEGATIONS OF RETALIATION FACTUALLY SUPPORTING A TITLE VII CLAIM

A plaintiff may prove retaliation either through the use of direct evidence or by showing that the employer's proffered non-retaliatory reasons for termination were pretextual. Fair Labor Standards Act of 1938 § 7, **29 U.S.C.A. § 215(a)(3)**. *Acosta v. Foreclosure Connection, Inc.*, 903 F.3d 1132 (10th Cir. 2018). In the complaint, a plaintiff must show that "(1) he or she engaged in a 'protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal* USA, Inc. (2005) 36 Cal.4th 1028, 1042 (Yanowitz).) "The statutory language….indicates that protected conduct can take many forms. Specifically, it is an unlawful employment practice '[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden …..or because the person has filed a complaint, testified, or assisted in any proceeding'" (*Ibid*.at 13)...*McLeod v. BTIG, LLC* (Cal. App. 2021).

The U.S. Supreme Court changed the causation standard for Title VII retaliation claims in University of Texas Sw. Medical Center v Nassar, when the Court held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000(e)3(a) must establish that his or her protected activity was a but-for-cause of the alleged adverse

action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S.
338, 133 S. Ct. 2517, 186 L. Ed. 2d 503, 24 Fla. L. Weekly Supp. 366
(2013), at 2534. Title VII retaliation claims must be prove[n] according to
traditional principles of but-for causation, not the lessened causation test" for
status-based discrimination. *Id*. at 2533. *Palm Beach Cnty. Sch. Bd. v.
Wright*, 217 So.3d 163 (Fla. App. 2017

This mandate was wholly inapplicable since COVID-19 vaccines do not
prevent infection or transmission and if COVID-19 vaccines are not
"immunizations against *vaccine-preventable diseases*" that would trigger authority
to mandate any experimental vaccines. If COVID-19 vaccines do not prevent
infection or transmission, then COVID-19 cannot be a "vaccine-preventable
disease," and Raytheon cannot exclude employees under these rules. The district
court's interpretation that allows Raytheon to exclude unvaccinated employees
from communal areas such as the gym, pool, and cafeteria is similarly erroneous.
First, the express language of these Executive Orders does not give Raytheon the
power to ban employees from travel or work-related events during "a *vaccine-
preventable disease* outbreak." The district court failed to accept as true Plaintiffs'
allegations that COVID-19 is not a vaccine-preventable disease because there is no
vaccine that prevents COVID-19.

## IV. THE DISTRICT COURT ERRED BY HOLDING THAT EMPLOYEES' DUE PROCESS AND EQUAL PROTECTION CLAIMS WERE SUBJECT TO RATIONAL BASIS REVIEW.

### A. Informed Consent is A *Fundamental* Right.

The district court completely ignored a line of cases decided since *Jacobson*, examining the right to informed consent and its corollary right to refuse unwanted medical treatment under the Due Process Clause of the Fourteenth Amendment. *See Washington v. Glucksberg*, 521 U.S. 702 (1997); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990); *Washington v. Harper*, 494 U.S. 210 (1990); *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Ingraham v. Wright*, 430 U.S. 651, 673 (1977); *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990); *Rennie v. Klein*, 653 F.2d 836, 844 (3d Cir. 1981). Since *Jacobson*, the Supreme Court and this Court have come to recognize the right to informed consent and to refuse unwanted medical treatment is "deeply rooted in this Nation's history and constitutional traditions." *Glucksberg,* at 725, *see also Cruzan,* at 269. ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"). As a result, these rights must be regarded now as "fundamental," and these precedents require a court revisiting vaccine challenge today to employ a heightened standard of review if not strict scrutiny – but definitely not "rational basis." *See Washington v. Glucksberg*, 521 U.S. 702 (1997) (examining the right to informed consent);

*Washington v. Harper,* 494 U.S. 210 (1990) (the significant liberty interest in avoiding unwanted administration of antipsychotic drugs); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990) (the constitutionally protected right to refuse lifesaving hydration); *see also Youngberg v. Romeo,* 457 U.S. 307, 316 (1982) (liberty from bodily restraints); *Ingraham v. Wright*, 430 U.S. 651 673 (1977) (freedom from unjustified intrusions into the body); *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990) (the right to information necessary to exercise informed consent); *Rennie v. Klein*, 653 F.2d 836, 844 (3d Cir. 1981) (the right to refuse unwanted medical treatment).

The district court also ignored the now well-settled unconstitutional conditions doctrine that "the government may not deny a benefit to a person because he exercises a constitutional right." *See Koontz v. St. Johns River Water Mngmt. Dist.*, 570 U.S. 595, 604 (2013); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 269 (1974). This doctrine applies in the university context. *See Perry v. Sindermann*, 408 U.S. 593 (1972) (public college violates a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration). "Those cases reflect an overarching principle, known as the

unconstitutional conditions doctrine, which vindicates the Constitution's enumerated

rights by preventing the government from coercing people into giving them up."

*Koontz*, at 604 (citing *Perry v. Sindermann*, 408 U.S. 593 (1972).  "[R]egardless of

whether the government ultimately succeeds in pressuring someone into forfeiting

a constitutional right, the unconstitutional conditions doctrine forbids burdening

the Constitution's enumerated rights by coercively withholding benefits from those

who exercise them."  *Koontz*, at 606.  The district court ignored all of these

precedents. According to the Supreme Court, that liberty emanates from the

common law principle that "even touching of one person by another without

consent and without legal justification was a battery."  *Id.* at 269.  "Before the turn

of the century, [the Supreme Court] observed that no right is held more sacred or is

more carefully guarded by the common law than the right of every individual to the

possession and control of his own person, free from all restraint or interference of

others, unless by clear and unquestionable authority of law."  *Id.* (citing *Union

Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). Since *Jacobson*, "[t]his notion

of bodily integrity has been embodied in the requirement that informed consent is

generally required for medical treatment."  *Id.* (quoting *Schloendorff v. Society of

New York Hospital*, 211 N.Y. 125, 129-130 (1914) ("Every human being of adult

years and sound mind has a right to determine what shall be done with his own

body; and a surgeon who performs an operation without his patient's consent

commits an assault, for which he is liable in damages.").  Hence, the Supreme

Court concluded "[t]he informed consent

doctrine has become firmly entrenched in American tort law."  *Id.*

Following *Cruzan*, the Supreme Court went even further in *Washington v.*
*Glucksberg,* 571 U.S. 702 (1997), and settled the question that the right to

informed consent and refusing unwanted medical treatment are fundamental.  In

*Glucksberg,* the Supreme Court held that the Due Process Clause "protects those

fundamental rights and liberties which are, objectively, deeply rooted in this

Nation's history and tradition," and "implicit in the concept of ordered liberty,"

such that "neither liberty nor justice would exist if they were sacrificed."

*Glucksberg*, at 721.  Holding that substantive due process requires a "careful

description" of the asserted fundamental liberty interest, the Supreme Court in

*Glucksberg* concluded that "the right assumed in *Cruzan*" (the right to informed

consent) was not "simply deduced from abstract concepts of personal autonomy

but rather "the common law rule that forced medication was a battery, and the long

tradition protecting the decision to refuse unwanted medical treatment."  *Id.* at 725.

As a result, the Supreme Court held that the right recognized in *Cruzan* "was

entirely consistent with this Nation's history and constitutional traditions."

*Id.* At 724-25.  The only conclusion that can be drawn from these holdings is that

*Glucksberg* stands for the proposition that the right to informed consent and to

refuse unwanted medical treatment is a ***fundamental*** right. *Id.* at 725

(distinguished from the right to die which has not enjoyed similar protection). The

district court failed to weigh the effect of these binding precedents.

> The district court also ignored the express command of this Court:

> The Due Process clause of the Fourteenth Amendment
> substantively protects certain ***fundamental*** rights. Among these
> are the right to be free from unjustified intrusions into the body,
> *Ingraham v. Wright*, 430 U.S. 651, 673 (1977), the related
> right to refuse unwanted medical treatment, *Rennie v. Klein*,
> 653 F.2d 836, 844 (3d Cir. 1981), and as we decide today, the
> right to sufficient information to intelligently exercise those
> rights.

*White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990) (emphasis added); *see also*

*Leapheart v. Prison Health Services, Inc.*, No. 3:10-cv-1019, 2010 WL 5391315

(M.D. Pa. Nov. 22, 2010) at *6 ("[I]t is well-settled the Due Process Clause of the

Fourteenth Amendment substantively protects certain fundamental rights").

The district court was bound by this Court's precedent to view Plaintiffs'

rights to informed consent and to refuse unwanted medical treatment as

***fundamental***. Accordingly, Raytheon Policy must be "narrowly tailored to a

compelling state interest," and rational basis is the wrong test. *See Burson v.*

*Freeman*, 504 U.S. 191, 198 (1992) (when fundamental rights are at stake,

"the state must show that the regulation is necessary to serve a compelling state

Interest and that it is narrowly drawn to achieve that end").

Alternatively, the district court was required to follow *Jacobson*

conservatively and employ a *balancing* test – not a rational basis test – to
determine whether Raytheon Policy violates constitutional rights by balancing the
employees' liberty interests against the relevant state interests. *See Cruzan,* 497
U.S.at 278 (holding that *Jacobson* employed a balancing test and balanced an
individual's interest in declining an unwanted smallpox vaccine against the State's
interest in preventing disease.). In other words, rational basis review does not
apply. Experimental vaccines that do not prevent infection or transmission fall
within this inviolate "sphere" because they have "no real or substantial relation" to
Raytheon's express purpose of preventing the spread of disease and vitiate the
argument that these vaccines are necessary for the protection of others.

**B.      Unconstitutional Conditions Doctrine Prohibits Coercion.**

The district court in this case ignored Raytheon' coercion.
However, the unconstitutional conditions doctrine compels a court to acknowledge
it. *Koontz,* 570 U.S. at 606 ("we have recognized that regardless of whether the
government ultimately succeeds in pressuring someone into forfeiting a
constitutional right, the unconstitutional conditions doctrine forbids burdening the
Constitution's enumerated rights by coercively withholding benefits from those
who exercise them.") Challenges to vaccine mandates must consider the
unconstitutional conditions doctrine. "As in other unconstitutional conditions cases
in which someone refuses to cede a constitutional right in the face of coercive

pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury." *See Koontz*, 570 U.S. at 607. "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Id.* at 612. If Raytheon cannot order employees to get vaccinated with experimental vaccines, it cannot pressure them to do so either. Raytheon held their careers; achieved by years of work, study, toil, dedication, and significant personal investment. Termination from employment is devastating and poses life altering, career jeopardizing consequences. Raytheon knew the power it had by threatening to fire employees, suspending their health benefits, tuition reimbursements, stock options and careers indefinitely.

### C. Raytheon's Policy Requires Heightened Scrutiny.

*Jacobson* was decided before courts articulated tiers of judicial scrutiny, before the doctrine of unconstitutional conditions, before the right to informed consent, and the right to refuse unwanted medical treatment were recognized as fundamental. Therefore, *Jacobson* is somewhat instructive but most certainly not dispositive. *See Halgren v. City o Naperville*, No. 21-cv-05039, 2021 WL 5998583 (N.D. Ill. Dec. 19, 2021) ("[M]odern courts cannot adopt a blunt

application of *Jacobson's* 'substantial relation' deference test. Instead, courts must interpret *Jacobson* through the lens of constitutional analysis."); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74 (2020) (Kavanaugh, J., concurring) (addressing *Jacobson*, cautioned: "judicial deference in an emergency or crisis does not mean wholesale abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised."); *see also Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting) ("[I]t is a mistake to take the language in *Jacobson* as the last word on what the constitution allows public officials to do during the COVID-19 pandemic.").

*Jacobson* dealt with a nearly 100-year-old smallpox vaccine and a $5 fine. 197 U.S. at 23-24 and footnotes. This case is not *Jacobson*. COVID-19 vaccines existed for only nine months before Raytheon mandated them. There were so many unknowns about the efficacy and safety of novel COVID-19 vaccines, the district court was not in a position to assess the relationship between an experimental vaccine, Raytheon's purported interests and Plaintiffs' fundamental liberties without a more developed adversarial record.

*Jacobson* holds that government action to mandate established vaccines must be subject to "reasonable conditions," "necessary for the public health or public safety," and proportional to the "necessity of the case." 197 U.S. at 26-28.

Thus, *Jacobson* requires vaccines to be efficacious, safe, necessary, proportional and to accord with fundamental rights. 197 U.S. at 27-33 ("if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."). These requirements must be harmonized with the current view that the right to informed consent and refuse unwanted medical treatment are now "fundamental," and that plaintiffs' coerced liberty interest is entitled to greater protection.

The district court ignored these precedents and misread the substance of Plaintiffs' Due Process Claims. Employees are not arguing against any and all vaccine requirements, but rather against the mandate of an *experimental* vaccine, with no evidence that it prevents infection or transmission, with so many unknowns about safety or long-term health effects and thousands of reports of serious adverse reactions and deaths. Those facts cannot be discounted, ignored, or not accepted as true on a motion to dismiss.

In sum for COVID-19 experimental vaccines to satisfy the requirements of *Jacobson, Cruzan, Gluksberg, Napoleon* and *Koontz* today, COVID-19 vaccines <u>must</u> be proven to prevent infection and transmission, their risks and safety profile must be known; and a mandate must be narrowly tailored (or real and substantially

related) to its purpose, so that individuals and the entities that mandate them can assess whether the benefits truly outweigh the risks, and the mandate is necessary. Employees maintain that Raytheon has never had the information to make these assessments and never tried. Consistent with these precedents, strict scrutiny or at least a heightened review should be applied to their claims, not a rational basis review that is essentially a foregone conclusion of constitutionality.

### D. Raytheon Policy Fails Even Rational Basis.

In the alternative, if this Court affirms rational basis review, at this stage, on the current record, assuming Plaintiffs' facts are true, Raytheon Policy does not meet the requirements of rational basis because there are too many unknowns about COVID-19 vaccines. The expressed purpose of Raytheon Policy is to "minimize outbreaks of COVID-19" and to "prevent and reduce the risk of transmission of COVID-19" in the workplace. These are legitimate interests, however Plaintiffs also allege that Defendants' financial relationships with the federal government create conflicts of interest that may explain its initial decision to issue a mandate. Reading these facts in the light most favorable to Plaintiffs and drawing all reasonable inferences from them, Raytheon may not have pursued a legitimate interest.

First, and foremost, according to the FDA, there are insufficient data to know the efficacy of currently available COVID-19 vaccines or boosters in

preventing asymptomatic infection or transmission of SARS-CoV-2.(1)

It is irrational to mandate a vaccine that does not work.

Second, according to the FDA, there are insufficient data to know that

COVID-19 vaccines as safe.(1)(9)(11). There are absolutely no data or

information concerning whether COVID-19 vaccines pose any long-term risks.

(11)(12)(13). With this information lacking, whether the benefits of COVID-19

vaccines outweigh their risks is unknown.(8)(9)(11). It is irrational to mandate a

vaccine without a full safety profile.

FDA permits use of all currently available COVID-19 vaccines under

Section 564 of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-

3, which is an "emergency use authorization" ("EUA"), whose purpose is to make

products available that have not gone through FDA's full safety and efficacy

review process. All currently available COVID-19 vaccines, testing

and even masks are made available under EUA, and the FDA is required to

ensure that individuals are informed of "the option to accept or refuse

administration" of EUA products. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). Even

clinical studies for Pfizer's "Comirnaty" vaccine are ongoing, (1), and in any

event, Pfizer's licensed vaccine is not currently available.(1).

As a result of their status as EUA products, COVID-19 vaccines are deemed

by the FDA and the NIH as "experimental" vaccines, and these agencies use those

terms interchangeably to describe them.  (1).  These vaccines were only

evaluated on human subjects for six (6) months before release, and clinical studies for

these vaccines are ongoing and will not be completed for several years, and the

FDA has never approved any face mask as being effective against COVID-19.

Significantly, if Plaintiffs' allegations are accepted as true, COVID-19

vaccines cause injury and death.  In less than a year, COVID-19 vaccines were

reported to kill and injure more people than all other vaccines tracked in the

government's VAERS since its inception in 1989.

In fact, rates of COVID-19 were lower when vaccines were unavailable.

Studies suggest that COVID-19 vaccines do not work, and whatever benefit

they impart wanes or boosters would not be needed.( 7 ).  These are not

"labels and conclusions," a "formulaic recitation of the elements of a cause of

action," or even "naked assertions devoid of further factual enhancement."

*Ashcroft*, 556 U.S. at 678.  These allegations are based on statements from the

FDA.

Plaintiffs pled that there are insufficient data to know that COVID-19

vaccines prevent infection or transmission, no data of long-term health risks, and

increasing data about death and injury caused by these vaccines.  (JA207-216).

Construing these facts in the light most favorable to Plaintiffs, there is no method for an employer mandating these vaccines to reasonably weigh the risk and benefits, and no way to assess how to mandate these vaccines in a reasonable manner to reduce the spread of contagious disease. The lack of knowledge and information as to whether these vaccines prevent transmission makes it impossible. To justify a mandate that is not rationally related to a reduction in transmission. Because of the alleged unknowns surrounding COVID-19 vaccines, mandating them is not sufficiently related to Raytheon' express purpose to reduce transmission in the workplace. Plaintiffs are not asking the Court to make its own judgments about effectiveness: Plaintiffs allege that the FDA already determined there was insufficient data to confirm COVID-19 vaccines prevented transmission. According to the CDC's own numbers, covid has a 99.74% survival rate.

In the case at bar, employment contracts were being re-negotiated without any benefit or consideration. In addition, the policy regarding exemptions continued to change. Often accommodation was not officially granted, as the defendants kept changing dates and making bad faith negotiations. Secondly, after the EO was overturned, RT functioned as a private employer in requiring vaccines. Several employee accommodations were accepted via email, only to be rejected at a later date, creating a pattern of accepting accommodations and then revoking the

same accommodation. 98% of all employees were already vaccinated. Only 2% were subject to new treatment, creating a protected class, with similar fact patterns.

Raytheon's own policy of masking ignored years of OSHA data regarding masks in the workplace.(10)(13)(14). In addition, Raytheon's policy ignored the carcinogenic nature of ethylene oxide, the compound used to sterilize both masks and PCR test swabs(2)(3)(8)(10). Other methods of testing were disallowed, and vaccinated employees were not required to mask despite updated CDC guidelines and the knowledge of breakthrough infections. Furthermore, the only industry in the world that bears no liability for injuries or deaths resulting from their products, are vaccine makers.

First established in 1986 with the National Childhood Vaccine Injury Act, and reinforced by the PREP Act, vaccine makers cannot be sued, even if they are shown to be negligent. A PREP Act declaration is specifically for the purpose of providing immunity from liability, and is different from, and not dependent on, other emergency declarations. The covid-vaccine makers are allowed to create a one-size-fits-all product, with no testing on sub-populations (i.e., people with specific health conditions), and yet they are unwilling to accept any responsibility for any adverse events or deaths their products cause.

The four major companies who are making these covid vaccines are/have either:

1. Never brought a vaccine to market before covid (Moderna, Johnson & Johnson).(18)(19)

2. Are serial felons (Pfizer, and Astra Zeneca).(16)(17)(21)

3. Are both (Johnson & Johnson).(18)(19)

In fact, all major vaccine makers (save Moderna) have paid out tens of billions of dollars in damages for other products they brought to market when they knew those products would cause injuries and death–see Vioxx, Bextra, Celebrex, Thalidomide, and Opioids as a few examples.

## V.  THE DISTRICT COURT ERRED BY RULING THERE WERE NO EQUAL PROTECTION CLAIMS.

The district court erred in its analysis of employees' equal protection claims, misunderstanding the nature of those claims.  Contrary to the Court's conclusions, employees alleged distinct violations of equal protection.  E mployees also alleged that Raytheon Policy unlawfully discriminates against them for invoking their Due Process rights,  which should be subject to a heightened standard of review as discussed *supra*.  Employees further alleged that naturally immune employees (who recovered from a COVID infection) were similarly situated to vaccinated employees and should be treated similarly.

Additionally, Plaintiffs alleged that Raytheon' decision to require only these

employees to wear masks, test weekly and be banned from travel, the gym, and other employee activities is another example of different treatment from similarly situated employees, as vaccinated and unvaccinated employees were similarly situated in their ability to contract and spread the virus equally – and Raytheon' intentional policy of treating them differently has no rational basis. The district court did not consider this disparity.

Instead, the district court erroneously concluded that by treating all unvaccinated persons the same (subjecting all unvaccinated persons to mandatory testing and masking), the employees failed to plead disparate treatment. However, the unvaccinated employees' claims concern disparate treatment from vaccinated employees. Such claims are recognized as "class of one" equal protection claims, governed by the Supreme Court's holding in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). U n d e r "class of one" equal protection claims: "a plaintiff must allege that (1) the defendant treated them differently from others similarly situated; (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Phillips v. County of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006); *see also DeMuria v.Hawkes*, 328 F.3d 704 (2d Cir. 2003). The district court did not conduct a "class of one" analysis between unvaccinated and vaccinated employees

or between vaccinated employees and naturally immune employees because it assumed facts that COVID-19 vaccines work, and natural immunity does not exist.

Accepting Plaintiffs' allegations as true, these "class of one" equal protection claims were properly pled because Raytheon Policy did not impose mandatory testing on vaccinated employees. Plaintiffs alleged that they were similarly situated to vaccinated employees because vaccinated employees were just as capable of spreading COVID-19. Thus, vaccinated, and unvaccinated employees were similarly situated and requiring only the unvaccinated employees to test or to be excluded from travel and other common employee activities is an arbitrary classification.

## VI. THE DISTRICT COURT ERRED BY FAILING TO SEE THAT THE PLAINTIFFS WERE ENAGED IN PROTECTED ACTIVITY VIS A VIS THEIR ONGOING EEOC COMPLAINTS.

The Initial Complaint sufficiently states that Plaintiffs were engaged in protected activity under Title VII, by opposing an unlawful employment practice. See 42 U.S.C. § 2000e-3; see *Crawford v. Met. Gov. of Nashville*, 555 U.S. 271, 276 (2009) ("When an. employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity."). All of the Plaintiffs had active

EEOC Complaints at the time of their termination. This fact was ignored by defendants, as they proceeded with the terminations in the face of pending complaints. Plaintiffs engaged in protected activity, fulfills the obligation to sufficiently allege causation. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."

The EEOC complaints were ignored by Raytheon and their policy had no room for exercise of informed consent. Instead, it employed coercion and undue influence. It was impossible for employees to s simultaneously and exercise the informed consent required by 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) and comply with Raytheon's Policy.

That their approach was deployed with the common good in mind (achieving herd immunity) and with good intentions (ending the pandemic as quickly as possible) does not alter the fact that such approaches were deeply misguided and represented deeply disturbing trends in public policy. Coercive covid vaccination mandates rested on several unproven postulates, (1) the vaccines were safe for everyone; (2) the vaccines were necessary for everyone; therefore, (3) any vaccine hesitancy is a public relations problem that must be overcome. This was a manipulative effort at behavioral control.

In the most precise meaning of the term, it was propaganda. Large swaths of the public who were not hypnotized by the repetition of memes could sense, even if they could not explain, that they were subjected to manipulation. As vaccination rates approached 50% in the United States, vaccine uptake slowed by April 2021. Reports began to emerge of serious side effects, and studies from Israel, which started its mass vaccination campaign before the US, suggested that vaccine efficacy waned rapidly. Public health efforts pivoted from propaganda to heavy-handed nudges and bribes. Several states entered vaccinated citizens into lotteries awarding cash prizes of $1 million or more. Other states and cities launched promotions for vaccination ranging from free beer in New Jersey to raffles for full-ride college scholarships in New York and Ohio to a free marijuana joint in Washington for those who took the jab. When these nudges did not work, officials simply mandated the vaccines, with severe penalties for those who declined.

In the case at Bar, this Hobbesian choice was the one presented to Plaintiffs. Sadly, it appears, we as a society were programmed to long for oppression, control, and the loss of our own human dignity. I am proud to represent people who chose not to sell everything we as a "civilized society" preach. They stood high on a hill, risked, and lost everything to hold to their beliefs, secular and non-secular, in the face of a totalitarian onslaught. I am a lowly "ham and egger" criminal defense attorney. The only attorney that would even talk to them in their

time of crisis. They inspired me, with their strength and resolution. Ignorance may be forgivable and curable through the application of a curious mind; willful ignorance is a devastating affliction without a cure.


## CONCLUSION

This Court should reverse the district court's rulings as a matter of law. It should also remand for further proceedings and a full adversarial record to adjudicate Plaintiffs' claims.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument concerning all issues presented herein.

Respectfully submitted,

*/s/ Nancy Knox Bierman*
LIBRA LAW TEXAS
204 Munford St.
Houston, TX 77008
(713) 836-9990 Libralawtexas@gmail.com
SBOT #24059177
*Counsel for Appellants*

## COMBINED CERTIFICATIONS

I, the undersigned, hereby certify the following:

1.      I am a member of the Bar of the United States Court of Appeals for the Ninth Circuit.

2.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,491 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. 32(a)(6) because it uses a proportionally spaced typeface: Microsoft Word in 14-point Times New Roman.

4.      The text of the electronic and paper versions of the foregoing brief are identical.

5.      A virus check was performed on this brief using McAfee Antivirus Software and that no virus was indicated.

6.      On May 4, 2023, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

Dated: May 4, 2023,                                 Respectfully submitted

                                                                    /s/ Nancy Knox Bierman

Nancy Knox Bierman
*Counsel for Appellants*